Filed 9/17/24  In re J.H. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.H., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>J.S., et al.,<br><br>　　Defendants and Appellants. | E083276<br><br>(Super.Ct.Nos. J296670, J296671 & J296672)<br><br>OPINION |

　　　　APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

　　　　Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant R.H.

　　　　Caitlin E. Howard, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

1

Tom Bunton, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

A mother and father appeal from orders terminating parental rights over their minor children. They argue the county welfare department's inquiry (the department) into their children's possible Indian ancestry under the Indian Child Welfare Act (ICWA) was inadequate, as the department was unable to contact one identified extended relative.[1] They also argue the trial court erred by failing to apply the beneficial parental bond exception to adoption. We find the department's ICWA inquiry was sufficient, and there was sufficient evidence to support the trial court's finding that the beneficial parental bond exception did not apply. We therefore affirm the termination of parental rights.

## BACKGROUND

*A. Dependency*

Defendants and appellants R.H. and J.S. are the mother and father, respectively, of the three children who are the subject of this dependency: G.S. (born 2014), M.S. (born 2020) and J.H. (born 2022).

The family initially came to the department's attention in June 2022, after a referral alleging physical abuse. The department interviewed G.S. privately, and he expressed that he felt safe around mother but not father. He said father sometimes hits

---

[1] Undesignated statutory references are to the Welfare and Institutions Code. "In addition, because ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

him, including punching him in the face and hitting him with a belt. Indeed, he said father hit him with a belt a few days earlier, and the department found a bruise on his left leg near his hip. G.S. also told the department father hit M.S. on the bottom. When interviewed, father admitted hitting G.S. with a belt. In response, the department made a safety plan with mother.

In April 2023 mother took J.H. to the hospital with injuries to his head, including bruising along the side of his forehead and a laceration on his upper lip. Mother alleged J.H. was sleeping with her on the bottom bunk of a bunk bed and she woke to him lying face down on the floor next to the bed. Father said he was at work at the time. Hospital staff reported that mother's story was not consistent with the injuries and they suspected abuse. Doctors eventually told the department J.H. suffered a subdural hematoma, fracture to the occipital part of his head, and a torn frenulum. The last of these injuries were consistent with forceful feeding, and the rest were consistent with abusive head trauma. The doctors also discovered bruises consistent with blunt impact or squeezing, and abrasions consistent with pinching. Finally, the doctors noted that J.H. had a severe diaper rash and low weight, suggesting neglect. In general, the doctors reported that it appeared J.H. suffered "multiple episodes of inflicted trauma and physical abuse."

After going to the hospital, social workers went to mother and father's home. They saw G.S. had a Band-Aid on his left cheek which he said was because he had been rubbing his face, and M.S. had scratches on her legs.

3

The department filed petitions under section 300 as to all three children. J.H.'s petition contained an allegation of serious physical harm under section 300, subdivision (a), and all three contained numerous allegations that mother and father failed to protect the children under section 300, subdivision (b). The next day the court found the petitions stated a prima facie case and ordered the children detained.

The department interviewed mother and father later that April. Mother told the department she never hit her children but that father "hits the kids." She also denied any domestic violence in the home, but described one instance where father hit her, she hit him back, and the police were called. Father admitted spanking G.S. once with an open hand and hitting furniture with a belt to scare them, but denied ever hitting them with a belt.

The department then visited G.S. and M.S. at their placement, where the foster parents reported that both children had abnormal bruising when they arrived, that G.S. had a lip injury, and that M.S. had severe diaper rash. They also reported that both children exhibited concerning behaviors. When a baby in the home cried, M.S. would shake her fists in the air while saying " '[f]uck, stop, stop stop.' " She was also very aggressive with the baby, at one point even taking a sippy cup and slamming it into the baby's face. In addition, she acted fearful after a small spill, wincing and repeating to herself " 'everything is ok, everything is ok.' " G.S. initially exhibited violent behaviors as well. Upon placement he became very angry, punched the table, kicked chairs, and threw things. He also made concerning statements, such as " '[m]y father is going to kill

4

me,' " and " 'he is going to beat me bad,' " and hid under the table afterward. He told the caregivers that he was present when a family member shot someone and then shot themselves, insisted that his younger brother was poisoned, and that mother and father give him beer "but he is not allowed to tell or he will be arrested by police."

The department interviewed G.S. alone. He told them that "he missed his mother and could hardly wait to see her." He said when he is in trouble he gets hit with a belt or with a hand on his back and butt. He said M.S. and J.H. also get hit, but the parents only use their hand on J.H. He reported that mother normally uses her hand, and father uses a belt. He said he gets hit because he is not a good kid, and that even though his parents spank him he still loves them. He told the department that "since the social workers came to the home that father was not going to hit him anymore." When asked what he would use three wishes for, he said "he wishes that he was a better kid, that he would listen, try my best, and [to] play with [his] sister and brother." He repeated the claim that he drank beer twice and was told not to tell anyone because he would go to jail. He said there was not any ongoing domestic violence, but recalled one time when " 'my dad hit my mom real hard.' " He told the department "that he loves his parents and is looking forward to visiting them."

The department filed several amended petitions. In their final form, all the children's petitions had multiple allegations of serious physical harm under section 300, subdivision (a), failure to protect under subdivision (b), and abuse of sibling under

5

subdivision (j). In addition, J.H.'s petition alleged severe physical abuse under section 300, subdivision (e).

The court held a contested jurisdiction and disposition hearing in October 2023. It sustained the allegations in the petitions. It also found by clear and convincing evidence that reunification services need not be provided because of the sustained allegations under section 300, subdivision (e). (§ 361.5, subd. (b)(5).) The court set a hearing under section 366.26.

Between the jurisdiction and disposition hearing and the section 366.26 hearing, the department reported the children did well in their placement. M.S. told the department that she likes her caregivers. G.S. also referred to the caregivers as " 'mom' " and " 'dad.' "

The parents were initially consistent with in-person visitation, but father had to leave for a few months for a work obligation and was not able to attend visits in person during that time. However, mother often called father via FaceTime for visits, and M.S. would gather around the phone or walk around the room with the phone while father was calling. The children were always happy to see him, and after he returned to in-person visits, G.S. "ran to him and jumped in his arms and buried his face in his chest." The parents would bring lots of gifts and snacks to visits. J.H. did not appear to have as close a relationship to father, crying and protesting when picked up. However, the children were generally eager to leave visits, and did not cry or express discomfort. The children

6

also referred to the caregiver as " 'Mom' " during visits, and did so consistently enough that mother stopped responding when they called for " 'Mom.' "

Though there were no issues with the children at visits, there were issues between the parents. The first visit after father returned from being away ended early because he and mother fought in front of the children. The caregivers eventually requested to have visits at a foster family agency because they did not feel safe hosting the parents. At a visit in January 2024, father brought a new girlfriend and the parents got into another verbal fight in front of the children. After that the parents visited separately. Moreover, a caregiver told the department that during visits father "does not engage," and mother mostly engages with the older two children. The caregiver did not see a close connection between the children and father, but "can tell that they love their mother."

Father testified at the section 366.26 hearing. He testified that he visited the children as often as he could given his work obligations, that he visited via video call when he could not be present, and that he had a close connection to them. He said the children called him daddy, hugged him, kissed him, and told him they loved him. He said they used to act pained when visits would end, and would cling to him and not want the visits to end. Both parents argued the court should apply the beneficial parent-child relationship exception to the termination of parental rights.

The court found the beneficial parent-child relationship exception did not apply. It stated it had "no doubt in its mind these children love their mom . . . [b]ut the Court is also cognizant of the emotional outbursts evidenced by these kids and, how under their

7

caregivers['] care, these are being ameliorated." Looking at the factors under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court concluded father's visitation was not consistent because "[t]here were months that went by without him visiting." The court acknowledged this was "through no fault of his, but *Caden C.* is what *Caden C.* is. I have to look at it literally." (Italics added.) However, it added that even if father met that requirement, neither parent met the second prong of the *Caden C.* analysis. The court was concerned that "[i]f Mom and Dad cannot control their behavior in a setting such as visitation, that gives the Court great concern with respect to these negative behaviors coming back again." The court also looked at whether there was "evidence that there is distress . . . when the parents have to go," and found that to the contrary, "when the visit ends, the children are eager to leave. [M.S.] grabs the caregiver's hand to walk out the door. That says a lot to this Court."

Accordingly, the court terminated the parents' parental rights. Both mother and father appealed.

*B. ICWA*

Both parents consistently did not know or denied any Indian ancestry throughout the dependency. Mother and father both filed Family Find and ICWA Inquiry forms. Mother identified and provided contact information for a godmother and two maternal aunts, one of which was unrelated by blood. The department contacted both maternal aunts and the godmother, all of whom denied any Indian heritage. Father identified and provided contact information for the same godmother and a paternal aunt, whom the

8

department had spoken with regarding the safety plan it put in place before this dependency. Sometime between October and November 2023 the department unsuccessfully attempted to contact the paternal aunt, both by calling and sending a text message.

At the 366.26 hearing, the parties stipulated the department attempted to call the paternal aunt four times that morning, and received messages indicating the subscriber was out of the area and the number could not be reached. The court then found ICWA did not apply.

ANALYSIS

Mother and father argue the department failed to conduct a sufficient initial inquiry as required by California law implementing ICWA because it failed to ask identified extended family members whether any of their children may be Indian children. They also argue the trial court erred when it did not apply the beneficial parental bond exception. We disagree and affirm.

*A. ICWA*

ICWA establishes minimum national standards "for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.) Under California law, the trial court and county welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) "This

9

continuing duty can be divided into three phases:  the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, at p. 566.)  Only the initial duty is at issue in this appeal.

The initial duty applies in every dependency.  (*In re J.S.* (2021) 62 Cal.App.5th 678, 686; see § 224.2, subd. (b).)  The initial duty expands under subdivision (b) of section 224.2, when a child is removed from their home.  Under that provision, "[i]f a child is placed into the temporary custody of a county welfare department pursuant to Section 306," the department's obligation includes asking the "extended family members" about the child's Indian status.  (§ 224.2, subd. (b).)  The Judicial Council revised rule 5.481 of the California Rules of Court to implement section 224.2, subdivision (b), by requiring inquiry of extended family in every case in which the department seeks to place the child.  (Cal. Rules of Court[2], rule 5.481(a)(1).)[3]

Our Supreme Court has recently held "that error resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in

_____

[2] Undesignated rule references are to the California Rules of Court.

[3] Opinions from our division disagree on whether that rule of court correctly interprets the statute by requiring the department to inquire of extended family members in every case where a child is removed from home.  (Compare *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 [holding the duty does not apply where a child is removed via protective custody warrant] with *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*), review granted Sept. 27, 2023, S281447 [holding the duty applies in all cases where children are removed from home].)  However, we need not address which interpretation we find persuasive, because we conclude that the department satisfied the more expansive duty of initial inquiry set out in *Delila D.* and its progeny.

10

compliance with rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3. When a Cal-ICWA inquiry is inadequate, it is impossible to ascertain whether the agency's error is prejudicial." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1136 (*Dezi C.*).) While that court did not address how to assess whether an inquiry was erroneous, it noted "[i]f a child welfare agency fails to obtain meaningful information or pursue meaningful avenues of inquiry—by, for example, failing to discover that a parent was adopted, or failing to inquire further after a parent identified an extended family member with more information about the child's potential Indian ancestry—those facts would be relevant to whether the initial Cal-ICWA inquiry is adequate." (*Id.* at p. 1151.)

"[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) Therefore, if "a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child." (*Ibid.*) However this rule only applies when there is a well-developed record, and " ' "the less developed the record, the more limited that discretion necessarily becomes." ' " (*Ibid.*) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th 614 at p. 640.)

11

Here, we are not reviewing a fact that comes through a trial court's resolution of an evidentiary conflict, but the trial court's implied finding that the department's "inquiry and due diligence were 'proper and adequate.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.) We thus are "not concerned with the outcome" as to the likelihood of whether the child is an Indian child. (*Id*. at p. 1144.) We are thus not to limit our review to "[e]nforcing the requirement of an adequate inquiry only in cases in which the record affirmatively demonstrates a reason to believe the child is an Indian child." (*Id*. at p. 1147.) Instead, we are "ensuring that tribal heritage is acknowledged and inquired about in dependency cases." (*Id*. at p. 1148.) This mission surely requires that we engage in a searching review to protect the tribal interests that *Dezi C*. explained are compelling and legally protected. (*Id*. at p. 1148.) Yet the deferential standard requires that we not find error just because the inquiry was not flawless.

We conclude the trial court's finding that ICWA did not apply, and therefore the implied finding that the inquiry was adequate, to be supported by substantial evidence. The department spoke to everyone mother and father were able to identify save for one notable exception. Though this was not a large number of people in all—the department was ultimately only able to talk to two maternal aunts—it was nevertheless duly diligent given the constraints. Indeed, we cannot ask for much more from the department when faced with such little information about the parents' extended families and no indication that unidentified family members may be reachable.

Nevertheless, father alleges the department erred by failing to inquire with the identified paternal aunt, and mother also argues the department erred by failing to independently identify extended relatives by referencing her own history with child welfare. Neither of these alleged failures are enough to reject the trial court's finding. First, the department did attempt to contact the paternal aunt, once in the fall of 2023 and four times the morning of the section 366.26 hearing. The first attempt at contact was via phone call and text message, and the paternal aunt never responded. The latter four attempts revealed that the phone number the department had for the paternal aunt could not be reached, suggesting that further attempts to contact her would be fruitless. In short, any information paternal aunt may have had was not readily obtainable, and therefore substantial evidence supports a finding that the department's failure to obtain that information did not render its inquiry inadequate. Nor is the department required to conduct an independent fishing expedition into a parent's child welfare history to identify extended relatives. The department's "obligation is only one of inquiry and not an absolute duty to ascertain or refute Native American ancestry." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413.) Mother did not identify or provide contact information for any maternal relatives besides the maternal aunt because she was not in contact with them. Therefore, there was substantial evidence to conclude the department had fulfilled its duty of inquiry by speaking to the relatives mother did identify.

*B. Beneficial Parental Bond Exception*

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 (*Jasmine D.*).) Adoption is the Legislature's preferred permanent plan. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D.*, at p. 1350.)

To avoid this outcome, the parent must show that termination of parental rights " 'would be detrimental to the minor' due to any of certain specified circumstances." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) One circumstance, the parental bond exception, applies where the parent can show they "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) There are three elements to this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child[ren] such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, italics omitted.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) For the second element, courts may take into account "a slew of factors, such as '[t]he age of the child,

14

the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) As for the third element "in assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632, italics omitted.)

On review, we apply the substantial evidence standard to the findings on the first two elements and a hybrid standard for the third. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) Specifically, we review whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship for abuse of discretion. (*Id.* at p. 640.) But we review any factual findings underlying that decision for substantial evidence. (*Ibid.*) In doing so, we look only at the evidence admitted at the 366.26 hearing. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 207-208.) This hybrid standard embodies the principle that as the reviewing court, we may not "substitute [our] own judgment as to what is in the child's best interests for the trial court's determination in that regard." (*Caden C.*, at p. 641.)

The trial court found that father failed to demonstrate either of the first two prongs, while mother failed under the second prong. We conclude there was substantial

evidence to support the trial court's findings as to the second prong for both parents, and therefore need not address whether father's visitation was consistent enough.[4]

G.S. was clear and consistent in reporting father physically abused all three children and mother at minimum failed to protect them from this abuse. Indeed, all three children showed the scars of that treatment. G.S. told the department he believed he was hit because he was not a good kid, and would use a magic wish to make himself a better kid. He was happy that since the social worker intervened his dad would no longer hit him. When first removed he exhibited violent, angry behavior that calmed the longer he was away from his parents, and said he was afraid father would kill him and " 'beat [him] bad.' "

Though his much younger siblings did not articulate the same concerns, they too expressed signs that their relationship to their parents was not beneficial. M.S. appeared extremely distressed whenever a baby cried in her placement home, shaking her fists and repeating " '[f]uck, stop, stop stop' " in apparent imitation of behavior she saw at home. She was aggressive towards younger children in the home, and winced and attempted to self-soothe after a small spill. These behaviors indicate a fearful, anxious environment at

---

[4] While we need not address the trial court's findings regarding the first prong, we disagree with the trial court's implicit conclusion that only in-person visitation counts under *Caden C.* As the recent COVID-19 pandemic demonstrated, virtual visits may be the only feasible option for visitation in some circumstances, and there may be, for example, financial or work constraints that sometimes make that visitation appropriate. Crediting those virtual may at times be appropriate when considering the consistency of visitation, and *Caden C.* does not forbid considering virtual visits.

home, as does the fact that these behaviors subsided while the children remained out of the home.

Finally, the children's behavior during visits suggests that they did not have a strong, beneficial bond with their parents. They were often eager to leave visitation, did not exhibit any negative behaviors as they were leaving or after they left, and referred to the caregivers as mom and dad. Indeed, they called their female caregiver mom so consistently that mother learned to stop responding. J.H. even appeared somewhat fearful of father and did not like being picked up or held by father.

All of this is sufficient evidence for a court to conclude that the bond between the children and the parents was far from beneficial. Indeed, there is sufficient evidence to suggest that the relationship was actively harmful. While we join the trial court in saying that we do not doubt that the children love their mother, this does not mean their relationship with either mother or father was to their benefit, and there was substantial evidence to support the conclusion it was not.

Accordingly, we affirm the trial court's order terminating both parents' parental rights.

DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL                    
                                                J.

We concur:


RAMIREZ                   
                        P. J.

MILLER                    
                        J.

18